BAY STATE MILLING CO. *v.* SZUCS.

1. SALES—TRIAL—INSTRUCTIONS—WEIGHT OF EVIDENCE.
   In an action for the purchase price of flour, where plaintiff made a *prima facie* case, and the defense was that the flour was unfit for use, an instruction by the trial judge to disregard the testimony of an official of the board of health, a disinterested witness, that he had tested the flour and that there was nothing wrong with it, *held,* prejudicial.

2. SAME—AFFIRMATIVE DEFENSE—BURDEN OF PROOF.
   Since the burden of proof to establish the unfitness of the flour was upon defendant, instructions by the trial judge to the effect that the burden of proof rested upon plaintiff *held,* reversible error.

Error to Wayne; Brown (William B.), J., presiding.    Submitted October 10, 1923.    (Docket No. 76.)  Decided December 19, 1923.

Assumpsit in justice's court by the Bay State Milling Company against Steph Szucs, doing business as the Harrington Bakery, for goods sold and delivered. There was judgment for plaintiff, and defendant appealed to the circuit court.    Judgment for defendant. Plaintiff brings error.    Reversed.

*Daniel M. Lynch,* for appellant.

STEERE, J.    The Bay State Milling Company is a foreign corporation located in Winona, Minnesota, with a branch office at Detroit in charge of a manager who in June, 1921, sold 20 barrels of "Wingold short patent" flour, and 5/7 of a barrel of "pure Dark Rye" flour to defendant who runs a bake shop in Detroit.

Ten barrels were delivered on June 9th and 10 barrels with the rye on June 23, 1921, "terms: Net 10 days, no discount." Defendant receipted for it on the same dates as received "In good condition." The purchase price, which is undisputed, was $205.54. Defendant retained the flour, used approximately one-half of it, and later refused payment, claiming it was bad flour, unfit for use. Plaintiff brought this action in a justice's court of Wayne county to recover the purchase price, declaring on the common counts. Defendant pleaded the general issue with notice of special defense. Plaintiff recovered judgment for the full purchase price of the flour, and defendant appealed to the circuit court of Wayne county where on re-trial before a jury defendant had judgment in his favor.

Under its 10 assignments of error plaintiff's counsel especially urges and argues the two contentions that the trial court erroneously charged the jury as to the burden of proof, and in effect charged them to disregard proof of approval of the flour by the Detroit board of health as follows:

"Something has been said about the board of health O. K.'ing this flour and bread. You cannot consider that, because an O. K. of any kind in that language is not evidence for a jury. You do not know who it was that O. K.'d it. If it was to stand here you do not know who O. K.'d it, and cross-examination might show whoever it was did not know anything about flour at all. You have the right to test the weight of testimony and you would have a right to observe the witness and determine the weight and credit to be given to his testimony, whether or not he is prejudiced or biased, and his demeanor upon the stand, and so I did not allow that testimony in here, because it has no place here, it was not proper, was not admissible, so you won't pay any attention to that."

Defendant's wife, Rose Szucs, was the only wit-

ness sworn in his behalf.     She testified that her husband was working in the bakery and not able to be present at the trial; that they kept this flour in the bake shop and used about 10 barrels of it, which "was the first shipment, and the second shipment is still there."     Asked by her attorney if the flour furnished by plaintiff had "any peculiarities other than other bread from other flour that you used?" she said:

"Well, the bread that we baked out of Bay State Milling Company's flour, in twenty-four (24) hours had turned pink and it had an awful smell and we could not sell it to customers, so I took the bread to the board of health and had them look at it, so Mr. Hill, the board of health inspector, came down there and investigated the bake shop and took a sample of the stuff we put in the bread."

Asked on cross-examination what other things he took, replied:

"Well, he took some corn syrup, that is after he came with manager; after that, he came and asked me what was used in the bread and I told him corn syrup.     He took a sample of that because he told me the flour was all right.
"Q. What else did he take?
"A. That is all, flour, bread and corn syrup."

Mr. Hill, the inspector, who had been in that service for over 3 years and prior to that had learned and followed the baker's trade, testified that complaint of this flour was received from defendant on July 15th or 16th and he "had charge of the settling of their complaint from the time it was brought in until it was entirely straightened out," that the bread in the two loaves they brought to his office on making complaint was a very bad color, had a streak of pink in it and looked dirty.     He did not remember its odor and said in part:

"They brought two loaves of bread to my office and

I immediately went to the bake shop and retained all the flour pending analysis.    I took a sack of the flour and baked a sample of the bread; I stayed right with the operation from the time the flour was taken from the bakery until the bread was produced and it lasted up until about 7:30 that evening; I sent another sample to the Columbus laboratory of Chicago to have it analyzed and the report came back.    *    *    *

"Q. Mr. Hill, what was the result of the checking of the flour?

"A. We did not see any fault with it at all.

"Q. Did you examine the bread made from this flour?

"A. Yes; sir, I ate some of it, it was good bread.    I did not find anything in any way wrong with the flour. The flour was released.    I have been with the board of health of Detroit nearly 3 years and have examined flour on different occasions and this flour in my opinion measured up to the ordinary marketable flour used in the market.    *    *    *    I made some bread from the flour in question.    *    *    *    I ate some of the bread the next day and the day after, approximately 24 and 36 hours after the bread was made.    *    *    *    The bread I baked from the same flour was good, marketable, eatable bread.    I do not know what was put into the bread that I saw in the shop that was not baked in my presence."

Objections to the report of analysis of the flour from Chicago and an attempt to show plaintiff received an approval, or O. K. of the flour from the board of health were sustained.

It is fairly inferable, and had not objection to that inquiry been peremptorily sustained it could perhaps have been more fully shown that the so-called O. K. was given plaintiff by Hill, of the health bureau, who in fact so stated in effect.    He promptly acted in the matter officially on defendant's complaint, went to defendant's shop, retained the flour during investigation as he described, had a sample analyzed, made practical test by baking bread with it, says he had direct charge of settling this complaint from the time

it was made until it was entirely straightened out, that the flour measured up to the market standard, made "good, marketable, eatable bread, he found nothing wrong with it" and it "was released." He acted officially and was the only disinterested witness. At best the instruction complained of tended to prejudicially mislead and was, we think, reflected in the verdict.

Defendant was furnished the brand of flour he ordered. He receipted for it when delivered as received in good condition, used up about half of it, made no complaint until the bills for it were past due. Title to the flour had then passed to him. He refused to pay for it and when sued his only ground of defense was the special affirmative one, in avoidance, that it would not make good bread and was unfit for use. Upon the trial plaintiff proved a *prima facie* case and rested. Defendant only sought to meet this by proof of his special defense and plaintiff introduced testimony in rebuttal to meet that issue. The court erroneously charged the jury in effect that the burden of proof rested upon plaintiff throughout the trial.

"When a party having the affirmative of the issue introduces competent evidence in support thereof, and the adverse party instead of offering evidence upon the facts alleged by the plaintiff, sets up another and distinct fact in avoidance, then the burden of proof is upon him to establish such defense." *Manistee Nat. Bank* v. *Seymour*, 64 Mich. 59.

*Vide*, also, *Wyandotte Portland Cement Co.* v. *Bruner*, 147 Mich. 400; *Waterman-Waterbury Co.* v. *School District*, 182 Mich. 498 (L. R. A. 1915B, 626).

The judgment is reversed, with costs to plaintiff, and a new trial granted.

WIEST, C. J., and FELLOWS, McDONALD, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.