**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0286n.06

**No. 10-1486**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

*Mar 13, 2012*

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| KEIPER, LLC, | : | |
| | : | |
| Plaintiff-Appellant, | : | |
| | : | **ON APPEAL FROM THE** |
| v. | : | **UNITED STATES DISTRICT** |
| | : | **COURT FOR THE EASTERN** |
| | : | **DISTRICT OF MICHIGAN** |
| INTIER AUTOMOTIVE INC.,<br>d/b/a INNOVATECH SEATING<br>SYSTEMS, | : | |
| | : | |
| | : | **OPINION** |
| | : | |
| Defendant-Appellee. | : | |

**BEFORE: BOGGS and WHITE, Circuit Judges; BERTELSMAN, District Judge.**[*]

PER CURIAM. Plaintiff-Appellant Keiper, LLC ("Keiper") appeals the district court's grant of summary judgment to defendant on plaintiff's claims for breach of contract and declaratory judgment.

We conclude that the district court improperly allocated the burden of proof at the summary judgment stage and, further, that genuine issues of material fact exist. We, therefore, **REVERSE AND REMAND**.

---

[*] The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

**I.**

**A.** **Keiper and Intier Contract for Seat Recliner Systems**

**1. Terms and Conditions**

Defendant-Appellee Intier Automotive Inc. d/b/a Innovatech Seating Systems ("Intier") is a "Tier I" automotive supplier in the business of assembling powered automotive seats for sale to automobile manufacturers, including Chrysler. (R. 1 ¶ 2). Keiper is a "Tier II" automotive supplier specializing in the manufacture of the components of automobile seat-recliner systems. (*Id.* ¶ 1).

On September 7, 2004, Intier issued a blanket purchase order to Keiper for the purchase of recliner systems for Intier to use in seats that it had agreed to supply to Chrysler for installation in Chrysler Pacifica vehicles. (R. 64-2, Purchase Orders and Revisions). The Purchase Order was revised on February 15 and 16, 2005; April 1, 2005; April 24, 2006; May 3, 2006; and March 9, 2007. (*Id.*).

The first four Purchase Orders state: "This order is subject to the terms and conditions appearing on the reverse side hereof." Referred to by the parties as the "1998 Terms and Conditions," these provisions include certain warranties. Specifically, Paragraph 13 states:

> **Seller expressly warrants that all Goods and Services**, including without limitation any special tools, dies, gigs, fixtures, patterns, machinery and equipment obtained at Buyer's expense for the performance of that Order and/or which are to be the property of Buyer, shall conform to all drawings, specifications, samples and other descriptions furnished, specified or adopted by Buyer, **shall be merchantable, free from any defects in material and workmanship** and free of all liens, claims and encumbrances whatsoever. **If Seller knows, or has reason to know, the particular purpose for which Buyer intends to use the Goods or Services, Seller warrants that such Goods or Services shall be fit and sufficient for a particular purpose.**

2

> Seller's warranties are available to, and for the benefit of, Buyer, Buyer's Affiliates and their respective successors, assigns and customers and users of products containing Goods or Services. These warranties shall be in addition to all other warranties available under applicable law. **Seller shall indemnify and save Buyer,** Buyer's Affiliates and their respective successors and assigns **harmless from any breach of these warranties** and, for greater certainty, no limitations on Buyer's remedies in Seller's documents, if any, shall operate to reduce this indemnification. **Seller shall also indemnify Buyer from and against all liability or damages (including any lost profits, recall costs or other consequential damages) imposed upon Buyer resulting from acts or omissions of Seller in respect of Goods or Services.**

(R. 60 at 6) (emphasis added).

The April 24, 2006, and later Purchase Orders state: "The terms and conditions printed on the back of this purchase order have been superceded[1] and do not apply. Buyer's purchase order terms and conditions [] are available via the Internet at www.magna.com." (R. 64-2 at 8).

These "2005 Terms and Conditions" also contain warranties. (R. 64-4, 2005 Terms and Conditions). Paragraph 13, entitled "Warranties Regarding the Goods and the Services," states:

> **Seller expressly warrants that the Goods** and the Services . . . that are obtained at Buyer's expense for the performance of this Order and/or are or become the property of Buyer . . . **shall: (i) conform to all drawings, specifications, samples and other descriptions furnished, specified or adopted by Buyer**; (ii) comply with all applicable laws, regulations, rules, codes and standards of the jurisdictions in which the Goods or the Services . . . are to be sold; (iii) be merchantable; (iv) **be free from any defects in design, to the extent furnished by Seller or any of its subcontractors or suppliers, even if the design has been approved by Buyer; (v) be free from any defects in materials and workmanship; (vi) be fit, sufficient,**

---

[1] Intier is a Canadian company, hence this spelling.

**and suitable for the particular purpose for which Buyer intends to use the Goods . . . , including the specified performance in the component, system, subsystem and vehicle location and the environment in which they are or may reasonably be expected to perform . . . . For the purposes of clause (vi) above, Seller acknowledges that Seller knows the particular purpose for which Buyer intends to use the Goods** . . . .

(Doc. 64-4 at 5) (emphasis added).

Paragraph 13(c) states that "Seller shall indemnify and hold Buyer" and its customers harmless from any damages or claims arising from or as a result of "any breach of the Seller's Warranties." (*Id.*).

Finally, the 2005 Terms and Conditions contain a "Set-Off, Recoupment" clause:

In addition to any right of set-off or recoupment provided by law, all amounts due to Seller and its subsidiaries and affiliates shall be considered net of indebtedness or obligations of Seller and its subsidiaries and affiliates to Buyer and its subsidiaries and affiliates, and Buyer and its subsidiaries and affiliates may set-off against or recoup from any amounts due or to become due from Seller and its subsidiaries and affiliates to Buyer and its subsidiaries and affiliates however and whenever arising. Buyer may do so without notice to Seller or its subsidiaries or affiliates. If any obligations of Seller or its subsidiaries or affiliates to Buyer or its subsidiaries or affiliates are disputed . . . , Buyer may defer payment of amounts due until such obligations are resolved.

(R. 64-4 at 4).

## 2. Range of Motion of the Pacifica Seat Recliners

The design drawings for the recliner systems manufactured by Keiper called for a 38-degree range of movement, with the rear stop being at 56 degrees rearward of vertical and the full-forward stop at 18 degrees rearward of vertical, plus or minus two degrees at either end. (R. 70-4, Eupizi Depo. at 18). Intier engineer Corey Webber testified that "the recliners met the technical design specs." (R. 70-3, Webber Depo. at 153).

4

Intier engineer Frank Eupizi testified that the full-forward position of the Pacifica seat was such that the occupant could be seated normally, in contrast to other vehicles in which the full-forward position is at or forward of vertical, so that the seat's occupant would be "hunched forward" were the seat fully inclined forward. (R. 70-4, Eupizi Depo. 32). Eupizi further testified that, other than the Pacifica, he knew of no other production vehicle made between 2000 and 2009 that had a forward stop at or near the 18-degree forward of vertical position. (*Id.*).

Eupizi also testified that Chrysler determined the shipping position of the seats after assembly by Intier, that the position specified was "seatbacks full up," and that shipping with the seats in the full-forward position is "typical" in the industry. (R. 70-4, Eupizi Depo. 23-24). Rodney Dalgord, another Intier engineer, also testified that the seats were shipped in the 18-degree position. (R. 70-6, Dalgord Depo. at 28).

**B.      Seat Malfunctions and Warranty Returns**

In April 2005, some Chrysler Pacifica owners began returning their vehicles due to malfunctioning front-seat- recliner motors. (R. 64-6 at 2, Keiper 7-Step Corrective Action Plan). Between April 2005 and June 2006, approximately forty of the motors were returned to Keiper. (*Id.*) Most returns comprised just the motors themselves, but some also included the seat assemblies. (R. 64-5, Brassat Depo. at 125, 131-32). Keiper's Director of Engineering, Dirk Brassat, testified that, where the returns included the full assembly, he observed that the seats were all in the full-forward stop position. (*Id.*).

Keiper conducted an investigation into the motor failures, which revealed that gears in the motors had jammed. (R. 64-6, Keiper 7-Step Corrective Action Plan Form, at 2-3). Under "Investigation of the Cause," Keiper's report states, in part:

> • All motors operate after disassembly, freeing of any jammed gears, and re-assembly without replacing the gearbox cover, and without replacing gears. Thus, the problem is in the gearbox.
>
> • **Seat backs were reported by the dealers to have been locked in "upright" to "normal" position when the affected vehicles were brought in. This may be at or near the full forward stop.**

(*Id.* at 3) (emphasis added).

The report further states: "Keiper has not found a violation of any existing specification or a deviation from normal manufacturing processes that would prompt containment activity." (*Id.*). Under "Root Cause," the report states that, where larger gears were installed in the production motors, the motors "survived 2 to 3 times the number of test cycles as motors of current production." (*Id.*). The report concludes by noting that the permanent design change with the larger gears had been approved by both Keiper and Intier, which would "improve the capability of the motor and thus **reduce** warranty occurrences." (*Id.* at 4) (emphasis added).

In August 2005, after conducting additional tests, Keiper updated its analysis and identified the cause of the motor failures as the design position of the forward stop for the Pacifica recliner. (R. 70-5, Brassat Aff. ¶ 7). Keiper recommended to Intier that the full-forward stop position of the seats for the Pacifica be moved forward, outside the range of the

6

common seating position.  (R. 70-3, Webber Depo. at 151, 154; R. 70-11, Brassat Depo. 109-10).

Based on the Pacifica returns, Chrysler began debiting Intier for their costs, which Intier, in turn, debited Keiper as set-offs against amounts owed for the purchase of the Recliner Systems.[2]

In late 2006, Intier prepared a "Corrective Action Process Issue Detail" report regarding the seat-back-recliner systems.  (R. 70-16).  This report states: "The supplier, Keiper, did not find violation of any existing specification or a deviation from normal manufacturing processes that would prompt containment."  (*Id.* at 3).  In a section titled "Root Cause Analysis," the report states that "Keiper found that the current revision 10 level motor design was within all specifications, but could be made more robust with design improvements."  (*Id.* at 4).  In the following section, however, the report states that the "component or process is non-conforming to the specifications."  (*Id.*).  Finally, in the section titled "Lessons Learned," this report states:

> **This motor design was used on multiple car lines without field issues and met all established specifications.  The unique Pacifica seating environment contributes to a higher than desired mortality.** DaimlerChrysler and the suppliers should jointly identify special vehicle environments that demand additional robustness.

(*Id.* at 6) (emphasis added).

---

[2] The parties apparently differ as to how much money Intier has debited and/or otherwise withheld from Keiper, but the district court noted that the amount is in the $1 million range or higher.  (R. 73 at 8).

On February 19, 2008, Keiper, Chrysler, and Intier representatives met regarding the recliner-motor warranty issues. (Doc. 70-12, Meeting Minutes). The minutes of this meeting state:

> A review of the past month's returns was undertaken. Along with 5 returned motors, two sets of Recliner assemblies were returned. **KEIPER points out that both Recliner sets were stopped in the full forward position when removed from the vehicle.** Both Intier and Chrysler accepted such as fact.
>
> KEIPER stated, based on extensive investigation that had been undertaken from 2004, that the position of the full forward stop is the root cause for the stalled motor returns. **Both Intier and Chrysler representatives agreed that there was no reason not to believe that the forward stop is a contributor.**

(*Id.* at 2) (emphasis added).

These minutes also state that Chrysler opined during this meeting that it was possible that Intier had shipped the Pacifica seats in the full-forward position and that the seats had remained that way until the vehicle was driven by a customer. (*Id.* at 3). Chrysler speculated that "the above-mentioned forward loading of the seat may induce 'pre-damage', hence affecting the life cycle of the motor." (*Id.*).

The minutes further state:

> Chrysler further stated that the motor issue on the recliner is "so similar" to the motorized gear failure on the CS seat back lumbar, with the lumbar motor shipped against a hard stop resulting in motor gears binding, motor stall. The team investigating the lumbar motor issue noted the 'delivery' condition. The team made a change to revise the process to ship with the lumbar system slightly forward of the "full off" condition. Per Chrysler, the effect of the shipping in a full off position was not fully known, but the change was judged directionally correct and simple to implement. (Intier implemented the process change in summer 2007 to help rectify this issue.) This was new information not previously provided to KEIPER.

(*Id.*).

Finally, these minutes reflect a discussion regarding the target market of the Pacifica ("less than 95 percentile male") and that certain customers experienced "visibility issues" which resulted in the "seat back being stored in the full forward stop (drivable position)," and that this "condition at a seat system level was not anticipated and hence, not reflected in the specification." (*Id.*).

On March 5, 2008, a Chrysler engineer and warranty executive stated in an email:

> At this point, I think there is agreement that the warranty failures were caused by an unexpected "hard stop" condition in the full up position.
>
> **However, the argument is now about who is "at fault" for the unexpected failures. Is Chrysler's "PF" to blame? Is Chrysler/Intier to blame for designing the recliner with the "up" stop only 4 degrees forward of design? Is Keiper at fault for not knowing about this design failure in their DFMEA and then giving direction on where to position the "up" stop?**

(R. 70-15 at 2) (emphasis added).

## C.      Litigation Ensues

Keiper filed suit in the Eastern District of Michigan on May 13, 2008, alleging claims for breach of contract and declaratory judgment based on Intier's refusal to pay amounts owed for its purchase of the Recliner Systems. (R. 1). In its Answer and Affirmative Defenses, Intier admits that its contractual relationship with Keiper is "governed by Intier purchase orders and Magna's terms and conditions." (R. 5, ¶ 23).

Intier filed its first motion for summary judgment on July 31, 2009. (R. 42). In response, Keiper argued that Intier had failed to support by affidavit its assertion that the

copy of the 1998 Terms and Conditions attached to its motion was, in fact, the terms and conditions actually found on the reverse side of the September 2004 purchase order. (R. 45, Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, at 18). Intier then attached to its reply brief a declaration so attesting. (R. 47).

On October 26, 2009, the district court entered an order requiring Intier to file a "legible" copy of the 1998 Terms and Conditions, apparently finding the existing copy difficult to read. (R. 58). Intier complied. (R. 60).

On November 4, 2009, the district court held a telephonic status conference. (Docket Minute Entry 11/4/09). Noting that several issues required additional briefing, the district court directed Intier to withdraw its pending motion for summary judgment and file a new motion covering all issues identified during the hearing.[3] Again Intier complied, withdrawing the pending motion (R. 63) and filing a revised motion for summary judgment. (R. 64).

D.     **The District Court's Opinion**

On March 22, 2010, the district court issued an Opinion and Order Granting Defendant's Motion for Summary Judgment. (R. 73). The district court first noted that, although there was some question about whether the claims were governed by Michigan or Ontario law, the parties agreed that there was no material difference between the two for purposes of the issues before the court. (*Id.* at 13).

---

[3] Because this hearing is memorialized by only a minute entry, the record does not reflect the court's full discussion. However, Keiper does not dispute Intier's account of the hearing.

Next, the district court held that Keiper bore the burden of proof on its breach of contract and declaratory judgment claims, and that this burden included showing that it performed its obligations under its contract with Intier. (*Id.* at 14). Further, the court held, Keiper bore the burden to "prove that it did not breach its Sellers Warranties, that it was not obligated to indemnify Intier for warranty costs, and that the setoff provisions of its contract with Intier were not triggered." (*Id.*).

The district court then addressed the warranty of fitness for a particular purpose found in the applicable Terms and Conditions. (*Id.* at 20). The court held that, because Keiper knew the purpose for which Intier intended to use the Recliner Systems, including the range of motion within which the seats would move in the Pacifica, "it is undisputed that it was obligated to supply Intier with Recliners that would not break when placed at any angle within that specified range of motion." (*Id.* at 22). The court further held that there was no evidence supporting Keiper's alternative theories as to why the motors failed. (*Id.* at 23).

The district court concluded: "Because Keiper breached its warranty of fitness for a particular purpose under both the 1998 and 2005 Terms and Conditions, Intier was entitled to deduct or set-off any amounts it had to pay for the warranty repairs from amounts it owes to Keiper for its Recliners." (*Id.* at 25). The court thus found it unnecessary to reach the issue of alleged design defects. (*Id.* n.4).

Keiper timely appealed. (R. 76).

11

**II.**

This court reviews a district court's grant of summary judgment de novo, construing the evidence and drawing all reasonable inferences in favor of the nonmoving party. *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011) (citation omitted).

**III.**

**A.      Burden of Proving Breach of Warranty**

The elements of a claim for breach of contract under Michigan law are: (1) the existence of a valid contract between the parties, (2) the terms of the contract require performance of certain actions, (3) a party breached the contract, and (4) the breach caused the other party injury. *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003) (citations omitted).

The district court reasoned that, because Keiper's contract with Intier contained express warranties regarding the goods sold thereunder, Keiper's burden of showing that it had performed its obligations under the contract included the burden of proving compliance with the warranties. We conclude that this reasoning is contrary to longstanding Michigan law.

In *Waterman-Waterbury Co. v. School Dist. No. 2 of Wyoming Twp.*, 148 N.W. 673 (Mich. 1914), the plaintiff company contracted to sell to the defendant school district a heating and ventilation system. The parties' contract included an express warranty "that this system will be constructed of first-class material, the same as described in the catalog, and manufactured in a careful, workmanlike manner free from defective material." *Id.* at 673. The contract further warranted that the system was guaranteed "to heat the schoolroom to

70 degrees during the coldest weather and to provide good ventilation during school hours."

*Id.*

The plaintiff installed the system and, after it was used to some extent, the defendant concluded that it did not operate satisfactorily and refused to pay for it. *Id.* The plaintiff filed suit for the payment due, and the school district defended on the grounds that the plaintiff had breached the warranties contained in the contract because the system did not perform as promised. The trial court refused to give a jury instruction proffered by the plaintiff which stated that the burden was on the defendant to prove a breach of the warranties. *Id.* at 674. Instead, the trial court instructed the jury, in pertinent part:

> Under its contract the plaintiff was required to install a heater that would heat the schoolhouse to 70 degrees during the coldest weather . . . . If the furnace, properly operated, would not heat the schoolroom to 70 degrees during the coldest weather, then it was not such a furnace as the plaintiff contracted to furnish, and the plaintiff would not be entitled to recover the purchase price under the circumstances of this case. . . . **(So, before the plaintiff is entitled to recover in this case, it must convince your minds, by a fair preponderance of the evidence, that it complied with its contract by furnishing a furnace that would, if properly operated, maintain a temperature of 70 degrees in the coldest weather.)**

*Id.* (emphasis added).

On appeal by the plaintiff after an adverse jury verdict, the Supreme Court of Michigan held that the above instruction was erroneous:

> In a case like the present, **where the article contracted for was delivered by the plaintiff and accepted by the defendant as in accordance with the contract and warranty, and the defendant relies upon an affirmative defense, it is clear that the burden of proof rests upon the defendant to establish the defense relied upon – in this case a breach of the warranty as to what the furnace would do under proper care and operation**.

*Id.* (emphasis added) (citations omitted).

Similarly, in *Smith v. Pickands*, 112 N.W. 122 (Mich. 1907), the plaintiff contracted to sell fruit trees, which the contract warranted would be "delivered in a healthy condition." *Id.* at 122. The defendant accepted the trees, some of which later died. The court instructed the jury that the burden was on the defendant buyer to prove that the trees were not, in fact, healthy when delivered. *Id.*

On appeal, the Supreme Court of Michigan held that the jury instruction was correct, noting that the burden of proof as to conformity with a warranty will depend on whether the goods are accepted:

> Had defendant never accepted these trees, this charge would have been erroneous. It would then have been an "essential part of plaintiff's case to prove that the goods tendered complied with the contract." . . . **But in this case the defendant had accepted these trees, and most of them did comply with the contract. Under these circumstances we think the burden rested upon her to prove that the trees so accepted did not comply with the contract**.

*Id.* (emphasis added) (citations omitted). *Accord Bay State Milling Co. v. Szucs*, 196 N.W. 355, 356 (Mich. 1923) (holding that where defendant buyer was furnished the brand of flour he ordered, accepted and used part of it, but later refused to pay for it on the grounds that it was unfit for use, the burden of proving the flour's condition was on him and not on the plaintiff seller); *R.G. Moeller Co. v. Van Kampen Constr. Co.*, 225 N.W.2d 742, 745 (Mich. App. 1975) ("[A]s to goods accepted, the burden is on the buyer to establish any claimed

breach of warranty.") (citing M.C.L.A. § 440.-2607.(4)[4]). *See also Alberta Ltd. v. Stedelbauer Chevrolet Oldsmobile (1975) Ltd.*, 2001 ABQB 909, 302 A.R. 316, para. 25 (Can.) (holding that burden is on purchaser to show defect that breaches warranty agreement).

The facts of this case are similar to those of the above cases. Keiper tendered the recliner systems to Intier, who accepted them and incorporated then into the seats it sold to Chrysler. Only later did malfunctions in some of the systems occur, prompting Intier to withhold payment.

Under the above authority, even though the warranty obligations were contained in the parties' contract, the burden is on Intier to prove that the goods it accepted were not in conformity with those warranties. It is thus immaterial that Intier does not label its defense to Keiper's claim for payment a breach of warranty "affirmative defense" when, in substance, that is exactly what it asserts.

We thus conclude that the district court erred in placing the burden on Keiper to show that it did not breach the contractual warranties in question.

**B.      Material Disputes of Fact Preclude Summary Judgment**

Having determined that the burden at the summary judgment stage was on Intier to show that Keiper breached its contractual warranties, the next question is whether summary judgment was nonetheless appropriate. We conclude it was not.

---

[4] This section of Michigan's Uniform Commercial Code states: "The burden is on the buyer to establish any breach with respect to the goods accepted." M.C.L.A. § 440.-2607.(4).

The record, as recounted above, demonstrates that there is a clear dispute of material fact as to whether Keiper complied with its contractual warranties in providing the recliner systems to Intier.[5] That is, there is a conflict in the evidence as to what caused some (and only some) of the recliner motors to fail: was it because the motors did not meet the specifications provided by Chrysler and Intier, or was there a superseding cause related to the placement of the seats in the full-forward position for extended periods of time by Intier, Chrysler, and ultimately by the consumers?

In finding no triable issue, the district court misconstrued or overlooked certain facts in the record. For example, in discussing the "7-Step Corrective Action Plan" report prepared by Keiper in its initial investigation of the motor failures, the court stated that there was "no mention" in the report of the seat full-forward position issue. (R. 73 at 6). This is incorrect. Under "Investigation of the Cause," the report specifically states that the seat backs were reported to be "at or near the full forward stop" position when returned to Chrysler dealers. (R. 64-6 at 3).

Indeed, the record is clear that in August 2005, just months after the warranty returns began, Keiper updated its root-cause analysis and informed Intier that it believed the root cause of the motor failures was the positioning of the seat backs in the full-forward position for extended periods of time, and it recommended that Intier modify the angle of the full-

---

[5] The district court correctly concluded that the evidence was sufficient to show that the 1998 and 2005 Terms and Conditions governed the parties' agreement. (R. 73 at 15 n.3).

forward incline point. (R. 70-3, Webber Depo. at 151, 154; R. 70-11, Brassat Depo. 109-10).

Intier's own report and the minutes of the February 19, 2008, meeting with representatives of all three companies support the conclusion that the recliner systems met all specifications and that the full-forward seat positioning was a possible contributing cause to the motor failures. (R. 70-16 at 6; R. 70-12 at 2-3). Indeed, Intier engineer Corey Webber testified that "the recliners met the technical design specs." (R. 70-3 at 153).

The email authored by Chrysler engineer and warranty executive, Gregory Pochmara, foreshadowed this dispute:

> At this point, I think there is agreement that the warranty failures were caused by an unexpected "hard stop" condition in the full up position.
>
> **However, the argument is now about who is "at fault" for the unexpected failures. Is Chrysler's "PF" to blame? Is Chrysler/Intier to blame for designing the recliner with the "up" stop only 4 degrees forward of design? Is Keiper at fault for not knowing about this design failure in their DFMEA and then giving direction on where to position the "up" stop?**

(R. 70-15 at 2) (emphasis added).

Although the district court found this evidence "speculative" (R. 73 at 24), that label belies the materiality of the above facts. Simply because the parties disagree as to what caused the motor failures does not mean, where there is evidentiary support for both positions, that resolution of the dispute depends on speculation.

For example, in *In re Atlas Concrete Pipe, Inc.*, 668 F.2d 905 (6th Cir. 1982), this court considered a similar dispute and concluded that the district court's grant of summary judgment was improper. There, the plaintiff pipe company entered into a contract with a

construction company to supply pipe for several sewer projects. *Id.* at 906-07. The contract incorporated certain specifications regarding the quality and performance of the pipe to be supplied by the plaintiff. *Id.* at 907.

After construction began, the defendant discovered defects in the pipe and consequently refused to pay outstanding amounts owed under the contract. *Id.* The plaintiff filed suit for breach of contract, and the defendant asserted, among other defenses, that the pipe failed to comply with the contract's specifications. *Id.*

The district court granted summary judgment to the plaintiff on the defendant's counterclaim that the pipe failed to meet the contract specifications, finding that "the qualitative defects in the pipe supplied did not cause the pipeline to fail the infiltration-exfiltration tests." *Id.* at 908.

This court reversed, holding that because the parties disputed the cause of the pipe's failure to meet the test specifications contained in the contract – the plaintiff asserted improper installation and the defendant asserted defective manufacture – "summary judgment is improper and the district court should afford the parties a full trial on the merits." *Id.* at 909.

So it is here. The record contains sufficient evidence from which a reasonable jury could conclude that Keiper complied with its contractual warranties, that the motor failures resulted from a superseding cause, and that Intier is therefore in breach of its contract by failing to pay Keiper the full amount due for the recliner systems it purchased. From the

same evidence, however, a jury could find in favor of Intier. Summary judgment is therefore inappropriate.

## IV.

For the foregoing reasons, we **REVERSE AND REMAND**.